[Cite as *State v. Gibson*, 2019-Ohio-1022.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-36 |
| | : | |
| v. | : | Trial Court Case No. 2017-CRB-3856 |
| | : | |
| REED AUSTIN GIBSON | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of March, 2019.

. . . . . . . . . .

MARC T. ROSS, Atty. Reg. No. 0070446, and MATTHEW DIBARTOLA, Atty. Reg. No. 0088702, Clark County Prosecutor's Office, Appellate Division, 50 E. Columbia Street, 4th Floor, Springfield, Ohio 45502
      Attorneys for Plaintiff-Appellee

VALERIE JUERGENS WILT, Atty. Reg. No. 0040413, and AMANDA J. LANTZ, Atty. Reg. No. 0090540, 333 N. Limestone Street, Suite 202A, Springfield, Ohio 45503
      Attorneys for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Reed Austin Gibson appeals from his conviction in the Clark County Municipal Court on a single count of obstructing official business. The judgment of the trial court will be affirmed.

### Factual and Procedural Background

{¶ 2} Shortly before 4:00 a.m. on October 31, 2017, Wittenberg University student Dustin Thornton was awakened by the sound of two men fighting inside one of the other apartments within the on-campus house where Thornton lived.[1] Thornton heard one man "yelling that he was going to kill the other one." After the fighting had continued for several minutes, Thornton went outside and knocked on the back door of the adjacent apartment. Inside he heard someone calling for help. Thornton then returned to his own apartment and called 911 to report the incident.

{¶ 3} At about 4:00 a.m. on that date, Officers Jordan Guillozet and Josh Thomas of the Wittenberg University police division responded to the house. They contacted Thornton, who described in more detail what he had heard. Using flashlights, the officers then went to the front of the house, where Officer Guillozet observed a broken window in a darkened first-floor bedroom, with "glass inside the residence" and what appeared to be a person "on the bed * * * with their shirt ripped and * * * covered in blood." Guillozet also saw a knife on a coffee table next to that person, who later was identified as Gibson.

{¶ 4} Identifying themselves as "the police," one officer called through the broken

---

[1] According to Thornton, the two-story house contained two single apartments and one triple apartment; each apartment had a different street address.

window while the other knocked on the front door in an effort to get someone inside the apartment to respond. Gibson eventually arose, exposing a significant laceration on his forehead. After some disjointed conversation through the window, during which Gibson expressed reluctance to admit the officers into the apartment, Gibson "got up, shut the lights off [on the porch and in the front hallway] and locked the deadbolt on the [front] door" before returning to his bedroom.

{¶ 5} Concerned that Gibson and/or someone else in the house might have serious injuries, the officers made several telephone calls, attempting to get authorization from University officials to enter the house without the residents' consent. During that process, however, Gibson exited through the front door, holding a telephone on which he was talking first to a dispatcher and later to a lieutenant with the Springfield police department. Gibson asked that an officer from Springfield be sent to the scene to tell the Wittenberg officers to leave. Officer Guillozet attempted to question Gibson to determine "if he [Gibson] was okay" and "where the other person [involved in the fight] was," but Gibson was intoxicated, "uncooperative," and "just wanted to plead the [F]ifth." Officer Guillozet testified that Gibson told the officers they "didn't have a right to be there" and that "[i]f [the officers] wanted to come in the house, [they] needed a search warrant."

{¶ 6} During the trial, the State played video footage from the bodycams both officers were wearing the night of October 31, 2017. That video recorded the following exchange that took place shortly after Gibson exited the house:

Officer Guillozet: I'm going to go in the house.

* * *

[Gibson]: [on telephone] They're, they're going into my house right now. I

do not give consent.

Officer Guillozet: Well, you're bloody, you're arguing with somebody else . . .

[Gibson]: You have to have a search warrant.

Officer Guillozet: . . . so I have probable cause to get into the house.

[Gibson]: Sir, you have, no, you do not.

Officer Guillozet: Yes I do.

[Gibson]: No you do not. I, you have to have a search warrant for that. I know my laws.

Officer Thomas: You obviously don't because it's called exigent circumstances . . .

[Gibson]: No you . . .

Officer Thomas: . . . and there are . . .

[Gibson]: Okay.

Officer Thomas: . . . people in your house . . .

[Gibson]: Alright.

Officer Thomas: . . . and we're going to . . .

[Gibson]: Alright.

Officer Thomas: . . . make sure they're okay.

* * *

[Gibson]: You can go ahead.

Officer Thomas: So hang tight.

[Gibson]: Go ahead. You're not . . .

Officer Thomas: Hang tight. Hang tight

[Gibson]: You're not going to, you're, you're not going [to] find anything.

\* \* \*

(*See* Trial Exh. #2); (*see also* Trial Transcript ("Tr."), pp. 91-92).

{¶ 7} While Guillozet checked for any other injured persons inside and to assure that the interior of the apartment was secure, Thomas remained on the porch with Gibson, who continued to be uncooperative and to invoke "the Fifth." Officer Thomas also called for medics to come assess the laceration on Gibson's head.

{¶ 8} Inside the apartment, Officer Guillozet found blood pooled, spattered and/or smeared on the hardwood floors, on the stairway and landing carpet, on walls, on interior doors and door frames, and on the toilet, sink and bathroom floor. He also found blood stains on the sheets and pillows in Gibson's bedroom. Photographs of those bloodied areas were presented to the jury. While walking through the space, Officer Guillozet encountered another male student who appeared to be uninjured; that man confirmed that he was a resident of the house. When the second student approached the front porch where Gibson was being held, Gibson called him "Ben," and repeatedly instructed the second student to "plead the Fifth."

{¶ 9} Meanwhile, Officer Guillozet found a third male, Matthew Bayler, upstairs in the house. Bayler, who had a swollen nose and bruising and abrasions on and around his face, confirmed that Gibson had caused his injuries, but said that they were friends and that he (Bayler) did not want to press charges. Officer Guillozet radioed Officer Thomas to check on the status of the medics, believing Bayler also needed medical attention.

**{¶ 10}** Still on the porch with Gibson, Officer Thomas was attempting to question "Ben," over Gibson's repeated interjections. At that point, Gibson began to re-enter the apartment, contrary to Officer Thomas's instructions. Explaining his unwillingness to let Gibson go inside, Thomas stated:

> I only had one officer inside. [H]e [Officer Guillozet] didn't know what all was in the house yet. We did have a knife on the table. We didn't know what other weapons were in there. We didn't know who else was involved, what he [Officer Guillozet] was going into, and [Gibson] was keeping us from figuring that out and I couldn't have him going back inside with[, e]specially with the knife we hadn't secured yet.

(Tr., pp. 158-159).

**{¶ 11}** Thomas radioed Guillozet and requested his assistance downstairs on the front porch. Officer Guillozet returned to the porch, where he found Gibson "halfway in the door" and Officer Thomas telling Gibson to get back outside. When Gibson continued to refuse to leave the house, Guillozet grabbed Gibson and ushered him back out to the porch, where Thomas placed him in handcuffs.

**{¶ 12}** Medics from the Springfield Fire Division responded to the scene. They examined Gibson's head wound and determined that he needed further medical treatment. They also examined Bayler and recommended that he be seen at the hospital to check his complaints of head pain and possibly to have his split lip closed with stitches. However, the medics did not want to transport Bayler in the same ambulance with Gibson, who continued to be argumentative and uncooperative. Therefore, a second squad was called to transport Bayler.

{¶ 13} Gibson was charged with a single count of obstructing official business in violation of R.C. 2921.31(A), a second-degree misdemeanor. During a jury trial on that charge, Gibson testified that he and his roommates hosted a party on the night of October 30, 2017, during which Gibson and Bayler had "an altercation." (Tr., p. 192). Later, when Gibson was awakened by police officers shining a light through his broken bedroom window, he "didn't understand what was going on." (*Id.*). He initially thought "that they [the police officers] were the ones that had broken the window and that they were trying to break into my home to question me * * *." (*Id.*). He called the Springfield police department "just to feel reassured," and was instructed to go outside to talk to the Wittenberg University officers. (*Id.*, pp. 192-193). He did so, "wearing a t-shirt that had been ripped probably like three quarters of the way down[,] and jeans and barefoot." (*Id.*, p. 194). Gibson testified that he went back into the house because he "was really cold"; "I just thought I could get my coat real quick and come back." (*Id.*). Although he claimed that he did not realize that the investigation was still ongoing when he went into the house, Gibson admitted that a police officer had told him not to re-enter the house. (*Id.*).

{¶ 14} On cross-examination, Gibson acknowledged that he had tried to stop "Ben" from talking to the police officers. (*Id.*, pp. 199-200). He also admitted that he had been wrong about the officers' breaking his bedroom window, and that he did not know at that time whether Bayler might be suffering from a concussion or internal injuries. (*Id.*, pp. 101-102).

{¶ 15} The jury found Gibson guilty of obstructing official business. The trial court sentenced Gibson to a 14-day suspended sentence, $250 in fines, and court costs.

{¶ 16} Gibson appeals from that judgment, raising four assignments of error:

1) The trial court erred as a matter of law in failing to properly instruct the jury.

2) The trial court erred as a matter of law when it failed to include in its instructions to the jury, the specific instructions requested by Mr. Gibson.

3) The trial court erred as a matter of law in failing and refusing to answer the jury's question.

4) Structural errors by the trial court permeated the proceedings.

### *Law Regarding Obstruction of Official Business*

**{¶ 17}** R.C. 2921.31 provides in pertinent part as follows:

(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

(B) Whoever violates this section is guilty of obstructing official business. Except as otherwise provided in this division, obstructing official business is a misdemeanor of the second degree * * *

**{¶ 18}** To be guilty of the offense of obstructing official business, an individual must commit an overt act done with an intent to obstruct a public official, such as a police officer, and the act must succeed in actually hampering or impeding that officer. *State v. Davis*, 2017-Ohio-5613, 94 N.E.3d 194, ¶ 37 (2d Dist.). "The proper focus in a prosecution for obstructing official business is on the defendant's conduct, verbal or physical, and its effect on the public official's ability to perform the official's lawful duties." *State v. Henry*,

2018-Ohio-1128, 110 N.E.3d 103, ¶ 55 (10th Dist.), quoting *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 12 (1st Dist.). Verbal acts alone can constitute a "proscribed act" under R.C. 2921.31. *Id.* at ¶ 56, citing *State v. Jeter*, 1st Dist. No. C-040572, 2005-Ohio-1872, ¶ 23, *State v. Lazzaro*, 76 Ohio St.3d 261, 667 N.E.384 (1996). In fact, "Ohio courts have upheld convictions for obstructing official business in instances [where] an individual prevented law enforcement officers from gaining control of a situation [through] 'belligerent and argumentative' behavior." *Id.*, quoting *Wellman* at ¶ 13, and citing *State v. Florence*, 12th Dist. No. CA2013-08-148, 2014-Ohio-2337, ¶ 13 (affirming conviction for obstructing official business of defendant whose "purposeful loud, boisterous, and uncooperative conduct made the performance of [the police officers'] duties more difficult").

{¶ 19} "Generally, an individual can be found guilty of obstructing official business when he persists in performing a specific act [after] a police officer has told him to stop." *Girard v. Oakman*, 2018-Ohio-1212, 110 N.E.3d 530, ¶ 52 (11th Dist.). For example, the Third District Court of Appeals affirmed the conviction under R.C. 2921.31 of a man who "grabbed [his] briefcase, unzipped it, and put his hands wrist-deep into it" after "repeatedly" being told by police "to stay away from his briefcase." *State v. Watson*, 3d Dist. Union No. 14-09-01, 2009-Ohio-6713, ¶ 6, 36. Although the defendant in *Watson* claimed to have thought the officers intended to harass him by conducting a fabricated investigation, "his decision to disbelieve them, disobey their orders, and, in turn, to delay their investigation, was made at his own peril." *Id.* at ¶ 36. Similarly, the Fifth District Court of Appeals affirmed the obstructing official business conviction of a defendant who, when police officers arrived in response to a domestic violence complaint, refused to provide

information and also prevented her companion from providing any information to the officers, and repeatedly talked over the officers as they attempted to conduct their investigation. *See State v. Willey*, 2015-Ohio-4572, 46 N.E.3d 1121 (5th Dist.). According to that court, the defendant's "persistence in disregarding [the officers'] orders was sufficient evidence from which a rational trier of fact could conclude that [she] acted with the specific intent to prevent, obstruct, or delay [the officers] in [their] lawful duties." (Brackets sic.) *Id.* at 22, quoting *State v. Shepherd*, 5th Dist. Richland No. 14CA63, 2015-Ohio-4330, ¶ 30.

{¶ 20} We, too, have concluded that a police officer "was within her rights to arrest [the defendant] for obstructing official business" where the defendant "repeatedly refused to comply with [the officer]'s instructions." *Dayton v. Turic*, 2d Dist. Montgomery No. 20149, 2005-Ohio-131, ¶ 26.

### *Assignments of Error #1 and #2 – Jury Instructions*

{¶ 21} Although a trial court "has broad discretion to decide how to fashion jury instructions," such instructions must "present a correct, pertinent statement of the law that is appropriate to the facts" of the case. *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, citing *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4764, 24 N.E.3d 1147, ¶ 5; *State v. Lessin*, 67 Ohio St.3d 487, 493, 620 N.E.2d 72 (1993). Accordingly, "a court should not give an instruction unless it is specifically applicable to the facts in the case." *State v. Fritz*, 163 Ohio App. 3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 19 (2d Dist.), citing *State v. Guster*, 66 Ohio St.2d 266, 421 N.E.2d 157 (1981). "A trial court has discretion to determine whether the evidence adduced at trial was sufficient to warrant an instruction." *State v. Austin*, 8th Dist. Cuyahoga Nos. 106215 and 106530,

2018-Ohio-3048, ¶ 54, citing *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, 883 N.E.2d 1052, ¶ 72. "In reviewing the record to ascertain the presence of sufficient evidence to support the giving of a [particular] jury instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction." *State v. Stevens*, 2017-Ohio-498, 85 N.E.3d 119, ¶ 37 (12th Dist.), citing *State v. Davis*, 2016-Ohio-1166, 61 N.E.3d 650, ¶ 35 (12th Dist.).

{¶ 22} A trial court's decision to give or to withhold particular jury instructions is reviewed for an abuse of discretion. *State v. Pendleton*, 2d Dist. Clark No. 2017-CA-17, 2018-Ohio-3199, ¶ 44, citing *State v. Underwood*, 2d Dist. Montgomery No. 26711, 2016-Ohio-1101, ¶ 9. The facts and circumstances of the case are relevant in determining whether a trial court abused its discretion in giving a particular instruction. *State v. Grissom*, 2d Dist. Montgomery No. 25750, 2014-Ohio-857, ¶ 30, citing *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 65. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *Id.*, citing *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "An abuse of discretion includes a situation in which the trial court did not engage in a 'sound reasoning process.' " *Id.*, quoting *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶14; *see also Underwood* at ¶ 9 (abuse of discretion includes decisions that are "grossly unsound, unreasonable, illegal, or unsupported by the evidence").

{¶ 23} Gibson argues that the trial court erred "as a matter of law" both by "fail[ing] to advise the jury of the precise behavior for which [Gibson] had been charged" (Assignment of Error #1) and by declining to give "the specific instructions [Gibson]

requested." (Assignment of Error #2). Because those two assignments of error are related and subject to the same standard of review,[2] we will consider them together.

### a.    Failure to Instruct on "Precise Behavior" Charged

{¶ 24} In its final instructions to the jury after the close of evidence in Gibson's case, the trial court set out the elements of the offense at issue as follows:

> * * * [T]he defendant is charged with obstructing official business. Before you can find the defendant guilty you must find beyond a reasonable doubt that on or about the 31st day of October, 2017 and in Springfield, Clark County, Ohio the defendant without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official in any authorized act within his official capacity did an act that hampered or impeded the official in the performance of his lawful duties.

(Tr., p. 246). The foregoing instruction mirrored the language of *Ohio Jury Instructions*, CR Section 521.31, and was consistent with R.C. 2921.31's statutory language.

{¶ 25} Gibson's first assignment of error nonetheless argues that the trial court erred by giving that instruction without further elaboration. Observing that the complaint filed against him alleged that Gibson committed the offense of obstructing official business, "TO WIT," by going "back into his residence while officers were attempting to check for further injured parties inside the residence" (Trial Court Docket #1, p. 2), Gibson suggests that the trial court should have instructed the jury that it was restricted to considering Gibson's act of re-entering his residence as the basis for the obstructing

---

[2] Although Gibson suggests that de novo review applies, the appropriate standard of review in this case is for an abuse of discretion, as the afore-cited cases illustrate.

official business offense.[3] He further argues that the trial court compounded the error of that omission by refusing to instruct the jury in accordance with certain specific instructions he requested.[4] (Citing Tr., pp. 224-226).

{¶ 26} Due process of law entitles an accused to be advised "of the essential facts constituting the offense for which he is tried." *State v. Lackey*, 2015-Ohio-5492, 55 N.E.3d 613, ¶ 60 (2d Dist.). A charging document is "defective" if "one of the vital elements identifying the crime is omitted." *Id.* Not all facts surrounding an offense are "vital elements," however. "[A]n indictment generally is sufficient if it contains, in substance, a statement that the accused has committed some public offense therein specified." *State v. Sellards*, 17 Ohio St.3d 169, 170-171, 478 N.E.2d 781 (1985). "A certain degree of inexactitude of averments, where they relate to matters other than the elements of the offense, is not *per se* [sic] impermissible or necessarily fatal to a prosecution." *Id.* at 171. A defendant may obtain more specific details by requesting a bill of particulars. *Id.*, citing R.C. 2941.07. Additionally, "the prosecution is entitled to offer differing theories as to what actually transpired in the commission of an offense." *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 30.

{¶ 27} Contrary to Gibson's premise, a defendant charged with obstructing official business is not prejudiced when the conduct underlying the State's theory at trial differs

---

[3] The record reflects that after the trial court read the charge but before the jury retired to deliberate, Gibson's counsel requested a sidebar to question the trial court's omission of the "to wit" clause from the jury instructions. (Tr., pp. 249-250). The State argued that the "to wit" language was "not an element of the offense" and that "it would still be a valid charge" even if that language had not been included in the complaint. (*Id.*, p. 250). The trial court denied defense counsel's request that the trial court read the complaint's "to wit" clause to the jury. (*Id.*, pp. 250-251).

[4] *See* second assignment of error, below.

from the conduct specified by the State in the charging documents. *See, e.g., State v. Thomas*, 8th Dist. Cuyahoga No. 84728, 2005-Ohio-1840, ¶ 32-37 (even though evidence presented at trial focused on conduct different from that described in indictment for obstructing official business, State had not "abandoned its original theory of the case" to introduce a "distinct and unexpected theory of guilt"); *State v. Stayton*, 126 Ohio App.3d 158, 709 N.E.2d 1224 (1st Dist.1988) (affirming defendant's obstructing official business conviction based on evidence that she hampered police officer attempting to issue parking citations, even though bill of particulars charged that she "prevented" officer from doing so). Indeed, existing case law counsels that a trial court should not give jury instructions that narrowly define the exact conduct that may constitute an obstructing official business offense. *See State v. Bowman*, 144 Ohio App.3d 179, 189, 759 N.E.2d 856 (12th Dist.2001).

{¶ 28} In *Bowman*, the trial court's jury instructions regarding the obstructing official business charges against the defendants specified that each defendant had hampered a law enforcement officer in the performance of his duties "by pulling on" an individual the officer was attempting to arrest. *Id.* On appeal, the appellate court opined that the trial court "should not have added the phrase" about "pulling on" the suspect, as that "limit[ed] the jury to finding [the defendants] guilty only if [the jury] found that [the defendants] 'by pulling on [the suspect]' obstructed official business." *Id.* at 190. Because "[t]he record [wa]s replete with evidence of many other acts by which the jury could have concluded that [the defendants] obstructed official business," the jury should not have been limited to considering only one example that might satisfy the requirement of an overt act. *Id.*

**{¶ 29}** Having reviewed the transcript of Gibson's trial, we conclude that this record likewise is "replete with evidence" of acts by Gibson, in addition to his reentering the house, that a reasonable jury might find to have hampered or impeded Officers Guillozet and Thomas's investigation of the report of someone needing help at Gibson's residence. *See id.* The trial court did not abuse its discretion by adhering to the standard Ohio Jury Instructions and failing to give an instruction more narrowly tailored to reflect the "precise behavior" alleged in the original complaint. Gibson's first assignment of error is overruled.

> b.     *Failure to Give Specific Instructions Gibson Requested*

**{¶ 30}** Gibson's second assignment of error faults the trial court for declining to give a number of jury instructions [5] that Gibson proposed. [6] Before the trial court administered its final instructions, the trial court and counsel for the parties engaged in an extended discussion of the proposed instructions. (*See* Tr., pp. 218-227). We will address the trial court's denial of those instructions in groupings suggested by that discussion. [7]

> i. Proposed Instruction #1

**{¶ 31}** The record reflects the following:

[Gibson's counsel]: * * * [P]roposed jury instruction number one states that

---

[5] Gibson's brief refers to "14 specific requests" for instructions (Brief of Appellant, p. 1), but the record refers to "thirteen." (Tr., p. 221).

[6] Despite Gibson's assertion that his attorney "filed a Motion for Specific Jury Instructions" on February 6, 2018 (*see* Brief of Appellant, p. 1), no such motion appears on the docket produced by the trial court for this appeal. Nevertheless, we are able to glean from the transcript of the jury charge conference the substance of most of the instructions Gibson requested. (*See* Tr., pp. 218-227). To the extent the proposed instructions can be discerned from the record, we will address them.

[7] The trial court later confirmed that Gibson's objections to the trial court's denial of Gibson's specific jury instructions were preserved for purposes of the record. (*See* Tr., p. 251).

the defendant asserts that he has the right to privacy in his own home by way of the Fourth Amendment to the Constitution of the United States[,] which states that the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated and warrants shall issue but upon pre [sic] probable cause supported by oath or affirmation in particularly describing the place to be searched and the person or things to be seized. And that cites to the U.S. Constitution Amendment[,] Fourth Amendment. * * *

[Trial Court]: * * * [D]oes the * * * State want to be heard in regard to * * * number one * * *?

[Prosecutor]: Sure[,] Your Honor. * * * [I]t's really not even a jury instruction. It's just the recitation of the Fourth Amendment. * * * [T]he police conduct in this case is not what's at issue. This isn't a motion to suppress or anything like that. It's the defendant's conduct that's at issue. * * * [S]o I don't think it's * * * relevant here. * * *

* * *

[Gibson's counsel]: * * * [T]he testimony of the officers that the State used as witnesses indicated that my client * * * caused a delay in them accessing the[ ] home. At the time [Gibson] believed * * * he was entitled to protection under the Fourth Amendment of the Constitution[,] which is what he kept restating * * * [S]o it goes to intent and what he thought he was lawful in doing at the time.

[Trial Court]: Well[,] with all due respect[,] * * * if he misunderstands the

application of the law[,] repeating it fifty times will not make the misapplication * * * become effective. * * * [H]e's charged with a violation of the * * * Ohio Statute * * * [T]he * * * U.S. Constitution * * * doesn't give someone * * * more rights than they have * * * under these circumstances as they were described and testified to. * * * * I don't think they're entitled to a Constitutional * * * arguments [sic] under the circumstances of this case under the statute that's involved. So * * * let's go to number two.

(Tr., pp. 219-221).

{¶ 32} The trial court did not abuse its discretion by refusing to give a proposed instruction pertaining to constitutional concepts that were irrelevant to the offense with which Gibson was charged. Gibson's first assignment of error is overruled.

ii. Proposed Instructions #2, #3

{¶ 33} The second and third instructions Gibson proposed were as follows:

[Gibson's counsel]: [I]n order to find the defendant guilty of obstructing official business you must find that the defendant committed an affirmative act. And this can actually be combined with * * * the next one[,] because then an affirmative act is defined as any conduct physical, verbal that hampers or impedes the officer in the performance of his duties.

[Trial Court]: I actually think that's included in the instructions. * * *

* * *

[Gibson's counsel]: Well[,] this instruction indicates an affirmative act.

* * *

[Trial Court]: * * * I would * * * respectfully disagree with that. * * * I think did

an act that hampered or impeded is * * * the operative * * * phrasing. So

* * * I think that's what's the controlling * * * language[,] is to do an act * * *

as opposed to * * * resisting or * * * something passive. * * * So I'm sticking

with the * * * experts on this one. * * *

[Gibson's counsel]: Can I point something out in * * * the OJI [i]nstructions

for obstructing official business? It states that the trial judge should be

aware of current case law interpreting what constitutes a prohibited act

within the scope of this statute. And the instruction I just proposed is a 2018

case, *Posona* [sic] *v. McCord.*[8]

* * *

[Gibson's counsel]: I'm not asking you to change the description of OJI's

* * * obstruction of * * * official business[.] I'm just asking you to * * * add an

additional instruction for the jury[,] * * * stating that in order to find the

defendant guilty of obstructing you must find that the act was affirmative.

[Trial Court]: And I'm saying that I don't think the magic word is an

affirmative act[.] I think it's an act. So * * * you've made your motion[,] I'm

denying it. * * * [L]et's go to * * * number four.

(Tr., pp. 221-223.)

{¶ 34} This court also has recognized "that in order to violate the obstructing official

business statute a defendant must engage in some affirmative or overt act or undertaking

---

[8] The case Gibson's counsel presumably intended to cite is *Pisoni v. McCord*, 5th Dist. Stark No. 2017CA00111, 2018-Ohio-64, ¶ 36, where the appellate court stated, "Courts have generally required an affirmative act for the offense of obstructing official business." That case did not involve jury instructions.

* * *." *State v. Crowell*, 2010-Ohio-4917, 938 N.E.2d 1115, ¶ 11, quoting *State v. Harrell*, 2d Dist. Montgomery No. 21736, 2007-Ohio-4550, ¶ 12, and *State v. Prestel*, 2d Dist. Montgomery No. 20822, 2005-Ohio-5236, ¶ 16. However, Gibson has directed us to no case in which an Ohio court found that a defendant charged with obstructing official business was entitled to an "affirmative act" instruction. Furthermore, at least one Ohio appellate court has concluded explicitly that a trial court did *not* abuse its discretion by failing to give a requested instruction specifying that R.C. 2921.31 would require "an affirmative act in order to trigger culpability." *Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 27-28. "[A]fter reviewing the jury instructions as a whole," the court in *Wellman* determined that "[t]he jury could not have reasonably concluded, after hearing the instructions, that they could find [the defendant] guilty for a failure to act." *Id.* at 28.

{¶ 35} Like the court in *Wellman*, we determine that the jury instructions given by the trial court, taken as a whole, adequately apprised the jury that Gibson could be found guilty of obstructing official business only for an actual "act." Accordingly, the trial court did not abuse its discretion by failing to give Gibson's proposed jury instructions number two and three.

iii. Proposed Instructions #4, #5, #6

{¶ 36} The discussion relevant to Gibson's fourth through sixth[9] proposed jury instructions follows:

[Gibson's counsel]: * * * [P]roposed instruction number four is: * * * in order

---

[9] Although the record does not mention specifically proposed instructions five and six, we can infer from the context that the trial court addressed those proposed instructions in combination with proposed instruction four, and denied all three on the basis stated.

to find the defendant's physical actions constituted obstruction of official business the defendant's act must actually hamper or impede the official in the performance of his duties. And then it goes on to define hamper.

[Trial Court]: Okay. Well[,] I think * * * the same thing's going to apply here. * * * [W]e can beat a dead horse by trying to define every possible word in the English language or * * * we can tell 'em hamper or impede * * * and the jury can * * * use its common[ ]sense in defining what hamper or impeded means. * * * That would take us to seven * * *.

(Tr., pp. 223- 224).

{¶ 37} Once again, our review of the jury instructions as a whole leads us to conclude that the instructions as given sufficiently apprised the jury of all information necessary to find Gibson guilty or not guilty of the offense charged. The trial court did not abuse its discretion by declining to supplement the standard OJI instructions with additional instructions providing arguably redundant details. *See State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5 ("No purpose is served * * * by requiring courts to present redundant jury instructions or instructions that are so similar to other instructions to be presented as to be confusing.").

iv. Proposed Instructions #7, #8

[Gibson's counsel]: * * * [N]ow seven and eight go together.

* * *

[Gibson's counsel]: * * * In order to find the defendant's verbal conduct to constitute obstructing official business[,] you must find that the manner and context [sic] of the defendant's statement prevented a public official from

carrying out his lawful duty. If you find that the defendant's actions were verbal in nature you must give considerable latitude to citizens to express their views about the police and activities.

[Trial Court]: * * * I'm not even sure * * * that's appropriate in this case.

[Gibson's counsel]: Well[,] * * * I think that our argument was * * * strengthened by the testimony of Officer Guillozet when he was saying that my client used profanity and that impeded his investigation so that turns it to a verbal issue under obstruction. * * * [B]asically Guillozet * * * said that the profanity used by my client impeded his investigation. * * *

[Trial Court]: I think again it would confuse the jury * * * to allege * * * that the act * * * was verbal in nature and * * * it wasn't. * * * [G]oing back * * * [to] how the charge was written * * *. So again[,] * * * I'm gonna * * * take issue * * * with you making the argument for the [S]tate that they said it was a verbal * * * action. * * * It wasn't verbal[,] * * * [i]t was an actual act * * * that caused him to be arrested * * *.

(Tr., pp. 224-225).

{¶ 38} We first note that Gibson's seventh proposed instruction misstates the law. It is not true that in order to return a guilty verdict, the jury was required to find that Gibson's verbal conduct "prevented" the officers from carrying out their duty. Rather, proof that his conduct *hampered* or *impeded* the officers would be sufficient. *See State v. Jeter*, 1st Dist. Hamilton No. C-040572, 2005-Ohio-1872, ¶ 16 (defendant was "mistaken in arguing that the state was required to prove that [defendant]'s conduct actually prevented an arrest of a person violating the law"; "[t]he state merely had to prove that [defendant]'s

conduct obstructed the police from performing their official duties"). The trial court was justified in declining to give proposed instruction number seven for that reason alone.

**{¶ 39}** In addition, our review of the record reveals that Gibson's attorney in requesting those instructions mischaracterized Officer Guillozet's testimony. On cross-examination, Guillozet was asked whether Gibson at any time "display[ed] any threats of violence." (Tr., p. 116). Guillozet answered that Gibson was "just verbally upset, but nothing physically." (*Id.*). Defense counsel then asked, "He did continue to restate his constitutional rights, correct?" (*Id.*). Officer Guillozet replied, "Yes, and * * * he did * * * make a statement that had some profanities in it as well." (*Id.*).

**{¶ 40}** That was the entirety of Officer Guillozet's testimony about Gibson's use of profanity, elicited by Gibson's counsel. It in no way intimated that Gibson was arrested or charged based on his use of profanity. Accordingly, there was insufficient factual basis for proposed instructions seven and eight.

**{¶ 41}** Furthermore, we once again find that the standard OJI instruction given by the trial court "adequately informed the jurors that they had to find that [Gibson] had committed an affirmative act that hampered or impeded the officers in the performance of their duties," regardless of whether the "act" giving rise to culpability was physical or verbal. *See Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, at ¶ 28. The trial court did not abuse its discretion by refusing to give proposed instructions seven and eight.

v. Proposed Instructions #9, #10, #11, #12

**{¶ 42}** Gibson's ninth through twelfth proposed jury instructions all focus on the content of his verbal remarks to the officers, as illustrated by the excerpt below:

[Gibson's counsel]: * * * [N]umber nine. If the defendant's language did not constitute fighting words[,] a citizen's verbal assault on a police officer does not standing alone constitute criminal conduct.

[Trial Court]: Now again[,] * * * fighting words * * * don't seem to apply in this case. * * * [W]ords * * * are not why he was * * * cited * * *.

* * *

[Gibson's counsel]: * * * [W]e did include in our motion for special jury instructions number ten[,] fighting words are those by which their very utterance inflict injury or intend to incite an immediate breach of the peace. And I understand your stance on it. I can move to eleven.

[Trial Court]: * * * I just don't see it * * * being applicable in * * * this set of circumstances.

[Gibson's counsel]: * * * [N]umber eleven[,] the instruction is: otherwise[,] in order to find the defendant's verbal conduct punishable as obstructing official business[,] you must find that the defendant made unsworn false statements to a public official with the purpose to mislead, hamper, or impede the investigation of a crime.

[Trial Court]: Again, I don't think there's any allegation of unsworn false statements * * *.

* * *

[Gibson's counsel]: * * * [N]umber twelve is: a citizen may decline to answer the question or answer honestly but he cannot within [sic] impunity, knowingly and willfully answer with a falsehood.

[Trial Court]: And I think the same thing applies there[.] [H]e wasn't lying

* * * to the police . . .

[Gibson's counsel]: Right[,] but once again[,] Your Honor[,] * * * Officer Guillozet's testimony indicated that his investigation was delayed by my client's use of profanity. So my client based on these instructions is allowed to use profanity so long as it's not * * * defined as fighting words.

* * *

[Trial Court]: * * * [T]hose aren't the * * * facts * * * of this case * * *.

(Tr., pp. 225-227).

{¶ 43} Gibson has not demonstrated that the instructions he proposed regarding the content of his speech are an accurate statement of the law. "R.C. 2921.31 is content-neutral on its face. A person has a right to verbally protest a police officer's actions or even to argue with or curse at an officer. But that person does not have the right to hamper or impede the officer in the performance of the officer's duties." *Wellman* at ¶ 31. Therefore, even if Gibson's remarks to the police officers were truthful and did not constitute "fighting words," he was not insulated from prosecution under R.C. 2921.31 if his actions – verbal and otherwise – hampered or impeded the officers in the performance of their duties. *See, e.g., Turic*, 2d Dist. Montgomery No. 20149, 2005-Ohio-131, at ¶ 26 (affirming conviction under R.C. 2921.31 based in part on defendant's "belligerent conduct" toward officers); *Henry*, 2018-Ohio-1128, 110 N.E.3d 103, at ¶ 55 ("Ohio courts have upheld convictions for obstructing official business" based on defendant's " 'belligerent and argumentative' behavior"); *Florence*, 12th Dist. No. CA2013-08-148, 2014-Ohio-2337, at ¶ 13 (affirming conviction for obstructing official business of

defendant whose "purposeful loud, boisterous, and uncooperative conduct made the performance of [the police officers'] duties more difficult"); *N. Ridgeville v. Reichbaum*, 112 Ohio App.3d 79, 84, 677 N.E.2d 1245 (9th Dist.1996) (affirming conviction for obstructing official business of defendant who, among other acts, shouted so that police officer could not obtain another person's version of what had precipitated call). Gibson cites no legal authority to the contrary. The trial court's refusal to give proposed instructions nine through twelve was not an abuse of discretion.

vi. Proposed Instruction #13

{¶ 44} The discussion surrounding the last jury instruction Gibson requested was as follows:

[Gibson's counsel]: Our final proposed jury instruction is: defendant's mere refusal to disclose his name to a police officer will not support a conviction for obstructing official business.

[Trial Court]: * * * [H]e told 'em who he was[,] so * * * that really isn't an issue here either. * * * I think a number of these are not * * * on point * * * in terms of * * * what was testified to in this particular case. * * * I don't find them to be applicable. So * * * for the record[,] I'm stickin' with * * * the OJI instruction and the definition of purposely and * * * we'll trust the jury to be able to apply that to the facts * * * as they've been testified to in this case * * *.

(Tr., p. 227).

{¶ 45} The trial court correctly observed that Gibson did tell the officers his name. The court did not abuse its discretion by declining to give a requested instruction that was not supported by the evidence. *See Fritz*, 163 Ohio App. 3d 276, 2005-Ohio-4736, 837

N.E.2d 823, at ¶ 19.

{¶ 46} Gibson's second assignment of error is overruled.

### *Allegation of Error #3 – Jury Question*

{¶ 47} Following the jury instruction conference, Gibson's trial proceeded to closing arguments. (*See* Tr., pp. 243). The closing presented by Gibson's counsel included the following argument to the jury:

What you need to remember is that [Gibson] is only being charged for * * * [going] back into his residence while officers were attempting to check for further injured parties inside that residence. [Gibson] is not charged for being a little snot. * * * [B]eing annoying or like in this case the little snot that he was is not a criminal act * * *.

* * *

Just to make sure you all understand and that there's no confusion[,] * * * my client's not being charged for anything he said or anything he did other than trying to go back into his house to get his coat. So you can't consider in order to find him guilty that he used profanity. You can't consider in order to find him guilty that he plead [sic] the Fifth or told his friend to plead the Fifth. You can't consider in order to find him guilty that he was being argumentative. You can't find him guilty for not letting officers into his house to begin with. You can't find him guilty for being belligerent and you can't find him guilty for being drunk. * * * [Y]ou have to find that beyond a reasonable doubt [Gibson] went back into his house to specifically interfere with the investigation of the officers.

(*Id.*, pp. 239-241).

{¶ 48} The State, however, argued that the jury should consider "the whole totality of the conduct" Gibson displayed. (*See, e.g., id.*, p. 242).

{¶ 49} Although the trial transcript does not reflect such, the parties have stipulated that after some deliberation, the jury had a question for the trial court. According to the parties' joint stipulation to supplement the record, the following occurred:

1. During jury deliberations, the jurors submitted a hand[-]written question to the [trial court], which stated, "Are we supposed to consider only the Defendant's act of re-entering his house, or all of the acts by the Defendant?"

2. The Judge stated to counsel that his response to the jurors is that he would not answer their questions, and [would] "leave it up to them to decide."

(6/28/18 Joint Stipulation Supplementing Record on Appeal.) No further information about the jury question or the trial court's response appears in the record before us.

{¶ 50} The joint stipulation gives no indication that Gibson's counsel objected to the trial court's proposed answer at that time. In the absence of an objection to the trial court's response to a jury question, a party waives all but plain error. *See State v. Gibson*, 2d Dist. Greene No. 2017-CA-47, 2018-Ohio-3809, ¶ 48. To demonstrate plain error, it must be shown that "but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *Id.*, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16, citing *State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, 939 N.E.2d

147, ¶ 29. "The burden of demonstrating plain error is on the party asserting it." *Id.*, quoting *Quarterman* at ¶ 16.

**{¶ 51}** After reviewing the record, we cannot conclude that the trial court's response to the jury's question led to a manifest miscarriage of justice. Indeed, under existing Ohio Supreme Court precedent, even if Gibson's counsel had objected to the trial court's response, we cannot conclude that the trial court erred. *See State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995). In *Carter*, the trial court responded to a question from the jury "by refusing to instruct further, and by telling the jury that it had all the instructions it needed." *Id.* The Supreme Court stated "that where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request. A reversal of a conviction based upon a trial court's response to such a request requires a showing that the trial court abused its discretion." *Id.* Specifically noting defense counsel's failure to object to the trial court's response, the Supreme Court determined that trial court "acted within the scope of its discretion in view of the nature of the instructions previously given." *Id.*

**{¶ 52}** Under the circumstances before us, we also conclude that the trial court did not commit error, plain or otherwise. Gibson's third assignment of error is overruled.

### Allegation of Error #4 – Structural Errors Permeating Trial

**{¶ 53}** In his final allegation of error, Gibson contends that the judgment against him must be reversed because the trial court's errors "so permeated the entire conduct of the trial" that the court failed to "reliably serve its function as a vehicle for determination of guilt or innocen[ce]." In support of that proposition, he cites *State v. Colon*, 118 Ohio

St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, ¶ 20, *rev'd on other grounds, State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, paragraph one and three of syllabus.

{¶ 54} In *Colon*, the Ohio Supreme Court stated:

Structural errors are "constitutional defects that ' "defy analysis by 'harmless error' standards" because they "affect [ ] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." ' " (Brackets added in *Fisher*.) *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 17, quoting *State v. Fisher,* 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, at ¶ 9, quoting *Arizona v. Fulminante* (1991), 499 U.S. 279, 309, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302. * * * "[A] structural error *mandates* a finding of 'per se prejudice.' " (Emphasis sic.) *State v. Fisher,* 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, at ¶ 9.

"In determining whether an alleged error is 'structural,' our threshold inquiry is whether such error 'involves the deprivation of a constitutional right.' " *Id.*, citing *State v. Issa* (2001), 93 Ohio St.3d 49, 74, 752 N.E.2d 904 (Cook, J., concurring). If an error in the trial court is not a constitutional error, then the error is not structural error. See *State v. Issa* at 74, 752 N.E.2d 904 (Cook, J., concurring).

*Id.* at ¶ 20-21.

{¶ 55} The basis for the "structural error" identified in *Colon* was described by the Supreme Court as follows: "In summary, the defective indictment in this case failed to

charge all the essential elements of the offense of robbery and resulted in a lack of notice to the defendant of the mens rea required to commit the offense." *Id.* at ¶ 32.[10] In contrast, the alleged errors identified by Gibson as amounting to "structural error" are the trial court's failure to "record the arguments of counsel,"[11] refusal to answer the jury's question, failure to include the jury question in the record on appeal, and erroneous judgment entry indicating that Gibson was convicted on a guilty plea rather than a jury verdict. We determine that those alleged errors, even taken cumulatively, do not constitute structural error warranting reversal.

{¶ 56} As detailed in footnote 11, below, Gibson has not identified what "arguments of counsel" he contends should have been but are not included in the record. Without a proffer of such information in the trial court or supplementation of the record in accordance with App.R. 9, we cannot consider whether the trial court erred in that respect. Additionally, we determined above that the trial court did not abuse its discretion in responding to the jury's question during deliberations. The fact that we were able to address that issue based on the parties' joint stipulation about the jury question also negates the effects of any potential error in the trial court's failure to include that jury question in the record.

{¶ 57} Finally, although the trial court's judgment entry does indicate, mistakenly,

---

[10] Interestingly, the Supreme Court's later decision in *Horner* put into question even that purported "structural error." *See Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, paragraph one of syllabus.

[11] Gibson's brief fails to specify what arguments are alleged to have been omitted. However, the opening arguments of both attorneys are transcribed in the record (*see* Tr., pp. 62-66, 67-69), as are their closing arguments (*see* Tr., pp. 229-236, 236-242, 242-243), and their arguments regarding the jury instructions. (*Id.*, pp. 218-229).

that Gibson was convicted by guilty plea rather than pursuant to a jury verdict, that clerical error may be corrected through a nunc pro tunc order, in an exercise of the trial court's "inherent authority to correct errors in judgment entries so that the record speaks the truth." *See, e.g., State v. Ritchie*, 2d Dist. Montgomery No. 24088, 2011-Ohio-2566, ¶ 8. Gibson suffered no constitutional deprivation as a result of that clerical error. *See Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, at ¶ 20-21. Consequently, Gibson's fourth assignment of error is overruled. Nevertheless, this matter will be remanded to the trial court for the sole purpose of correcting that clerical error.

**{¶ 58}** The judgment of the trial court will be affirmed, and this matter will be remanded to the trial court to issue a corrective nunc pro tunc judgment entry.

. . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Marc T. Ross
Matthew DiBartola
Valerie Juergens Wilt
Amanda J. Lantz
Hon. Stephen A. Schumaker